518 P.2d 873

**Walter L. HENDERSON et al., Plaintiffs-Respondents,**

v.

**COMINCO AMERICAN, INCORPORATED, a Washington corporation, and FMC Corporation, a Delaware corporation, Defendants-Appellants.**

No. 10779.

Supreme Court of Idaho.

Oct. 16, 1973.

Rehearing Denied Feb. 7, 1974.

692

John L. Runft, Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, for defendants-appellants.

Langroise, Sullivan & Smylie, Boise, for plaintiffs-respondents.

McFADDEN, Justice.

This case arises from an action for damages resulting from the application of a herbicide, Sinox PE, in 1967, to peppermint fields of Walter L. Henderson and Darrel Olsen (plaintiffs-respondents).[1] Henderson and Olsen purchased Sinox PE from Crop-Serv Company of Nampa, Idaho, an outlet for Cominco American, Inc. (one of the defendants-appellants, hereinafter Cominco). Cominco had, in turn, obtained the Sinox PE from its manufacturer and developer, FMC, Inc., a Delaware corporation (the other defendant-appellant).

Henderson and Olsen farmed neighboring property in Ada County. Their land is a loam soil suitable for growing a wide variety of agricultural crops. Henderson first planted peppermint in 1961 and gradually increased his acreage to 170 acres in 1967. Olsen planted eighteen acres, his first crop during the fall of 1966 and the spring of 1967.

Like other peppermint growers Henderson and Olsen faced problems of weed in-

festation in their peppermint crops. If not controlled or eradicated weeds could crowd out the peppermint and diminish the crop yield. Also, some weeds taint the flavor of the peppermint oil. Prior to 1967 Henderson had employed mechanical cultivation, manual labor, geese, and even sheep to control weeds. Henderson found that these methods were not entirely satisfactory. In the spring of 1967 Henderson contemplated using a herbicide on his peppermint and discussed the matter with Kenneth Jenkins, an employee of Cominco. Jenkins recommended Sinox PE as an effective herbicide over competing brands and told him that Sinox PE had been successfully used on peppermint crops in Washington and Oregon. Jenkins advised that although Sinox PE was a pre-emergent herbicide, it could be applied after the mint sprouted with minimal harm to the mint but with effective weed control.

As a pre-emergent herbicide Sinox PE is applied to the soil's surface before annual weeds emerge; as the weeds emerge and contact the herbicide, it destroys the plant tissue. Thus, Sinox PE destroys only what it touches. If the herbicide contacted the leaf or stem of a plant, it would not translocate down into the root. In contrast, a hormonal herbicide translocates throughout the entire plant and destroys the entire plant. Sinox PE was designed to control only annual broadleaf weeds and grasses. Henderson admitted that his peppermint fields were infested with perennial weeds, morning glory and Canadian thistles; and Olsen admitted that alfalfa, a perennial, infested his fields.

On April 3, 1967, Henderson purchased Sinox PE from Crop-Serv Company and sprayed one application on his peppermint crop during early April until early May, 1967, except for a one and one-third acre plot to which he applied a test herbicide, Sinbar, manufactured by Dupont Chemical Company. Jenkins then talked to Olsen and encouraged him to use Sinox PE also.

1. Originally, a third farmer, Laverne Larsen, was a party plaintiff to this action. However, at the close of the trial the defendants' motion for new trial was partially granted

dismissing Larsen's suit since he had not purchased Sinox PE directly from either Cominco or FMC.

Olsen purchased some and sprayed his peppermint with it around the 24th or 25th of April, 1967. Both Henderson and Olsen applied Sinox PE to their peppermint in the same proportion (1½ gallons of herbicide in 40 gallons of water per acre) with Henderson's equipment. Jenkins advised them to apply 1½ gallons of Sinox PE to 30 gallons of water per acre; both applications conformed to mixing instructions on the containers and accompanying instruction pamphlet. Neither man read anything more than the mixing proportions, although there were usage cautions concerning moisture, temperature and soils on the container labels and in the pamphlet. Even though they used the same sprayer, it is not known whether they used the machine in the same manner or how the sprayer was calibrated.

Besides the instructions and warning appearing on the containers and in the pamphlets, there was a disclaimer in prominent red print on the container notifying the purchaser of risks inherent in the use of Sinox PE. Neither man read this disclaimer. Also, both men admitted they were ignorant about Sinox PE's chemical properties.

After his first application of Sinox PE Henderson discovered that there was unsatisfactory weed control in one of his fields. At Henderson's request Jenkins inspected the field. Henderson inquired if he should spray the field again, but Jenkins told him to check with personnel from the company. Within a few days after this inspection Jenkins brought a chemist, McCollum, from Niagara Chemical Company, a division of Cominco, to check Henderson's field. As a result of this inspection they recommended that Henderson put another application of Sinox on the 37 acre field in the same proportion as the first spraying. Around May 22, Henderson sprayed the 37 acre field with Sinox PE for the second time. On June 12, Jenkins and McCollum, again, along with Nylander and Jackson, visited the 37 acre field to check the weed control. Nylander

and Jackson were both employees of Niagara Chemical Company; Nylander was a sales representative and Jackson was a chemist. During this inspection Jenkins noticed some peppermint plants which appeared to be dying. Upon examining these plants he found that they had a "black ring around the root and above the black ring upward it was turning yellow and darkening."

When Henderson harvested his mint crop in 1967, seventy-five acres out of one hundred seventy acres were barren. Olsen lost the entire crop on a thirteen acre field which he had planted in the spring of 1967; on his remaining five acres which he had planted in the fall of 1966 he harvested a reduced yield of thirty-one pounds of mint oil per acre. Somewhat inconsistent with Henderson's and Olsen's loss is the fact that Henderson's thirty-seven acre field which had double application of Sinox PE was not barren, although it produced a diminished yield of mint. On the basis of these crop yields Henderson and Olsen instituted this action against Cominco and FMC for damage to their peppermint crops from the application of Sinox PE.

Both Henderson and Olsen filed separate complaints alleging breach of express and implied warranties and negligence against Cominco and alleging negligence and strict liability against FMC. By order of the district court the complaints were combined into one action alleging the following counts against Cominco: (1) breach of express warranty; (2) breach of implied warranty of fitness for a particular purpose; (3) breach of implied warranty by description; and (4) negligence for failure to test the product in the local area of application. Against FMC the combined action alleged: (1) negligence for failure to test the product in the local area of application and (2) strict liability in tort based upon the existence of a defect in the product. Henderson prayed for damages against Cominco and FMC in the amount of $101,968.75 including interest while Ol-

sen prayed for damages in the amount of $12,412.25. The case was tried before a jury. At the close of Henderson's and Olsen's case the defendants, Cominco and FMC, moved for an involuntary dismissal of all counts against defendants under I. R.C.P. 41(b). The district court granted the motion as to counts three and four of plaintiff's combined action against Cominco and to count two against FMC. At the close of the presentation of their case the defendants renewed their motion for an involuntary dismissal under I.R.C.P. 41(b) and for a directed verdict under I.R.C.P. 50(a). The district court denied these motions as to Henderson and Olsen. The jury returned a verdict of $41,682.95 in favor of Henderson and of $6,359.71 in favor of Olsen, and the district court entered judgment for those amounts. The appellants then moved for a judgment n. o. v., or in the alternative, for a new trial which the district court denied. From the judgment entered in favor of Henderson and Olsen, Cominco and FMC appealed.

The appellants have assigned numerous errors in the trial court proceedings. We believe the principal, determinative issues are: contributory negligence and actual cause. Both of these issues are common to products liability actions grounded in warranty or in negligence.

## CONTRIBUTORY NEGLIGENCE

■ There is little doubt that contributory negligence is a defense to a products liability action founded solely on negligence. This is true even where the plaintiff negligently failed to discover a defect in the product or where the plaintiff negligently failed to guard against its existence. See, Prosser, Handbook of the Law of Torts, § 103 at p. 670 (4th ed. 1971); 1 Hursh, American Law of Products Liability, § 2.121 (1961); Noel, D. W., Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk, 25 Vand.L.Rev. 93, 112 (1972).

Unfortunately, the law is in confusion and flux regarding the effect of plaintiff's negligence on products liability actions founded on breach of warranties. A good deal of this confusion results from disagreement concerning the correct label to bestow on plaintiff's behavior. The leading commentator analyzes the cases as follows:

> *"Where the negligence of the plaintiff consists only in failure to discover the danger in the product, or to take precautions against its possible existence, it has uniformly been held that it is not a bar to an action for breach of warranty.* Thus if he eats a wormy candy bar, or drives negligently on a defective tire, without being aware of the defect, his recovery is not barred, even though he ought to have discovered it. This is entirely consistent with the rule applied to other strict liability involving animals, or abnormally dangerous activities. But if he discovers the defect, or knows the danger arising from it, and proceeds nevertheless deliberately to encounter it by making use of the product, his conduct is the kind of contributory negligence which overlaps assumption of risk; and on either theory his recovery is barred." (Emphasis added.) Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L.Rev. 791, 838 (1966).

See, Prosser, Handbook of The Law of Torts, § 103, p. 670 (4th ed. 1971).

Similarly, the leading products liability treatise also suggests that contributory negligence, in its broad common law sense, is generally *not* a defense to products liability actions founded on breach of warranties:

> "While there is authority to the contrary, it is arguably the better view that contributory negligence as such, as distinguished from misuse of the product, is not a defense [to a warranty products liability action]. Depending upon the facts, the distinction between contributory negligence and misuse of the product may be nothing more than a matter of semantics. In other words, some courts

have talked of contributory negligence as a defense in warranty when they could have said instead that there was misuse or voluntary and unnecessary exposure to risk with knowledge of the danger, which generally is a defense to strict liability." 2 Frumer & Friedman, Products Liability, § 16.01[3] (1972).

 agree with the position that contributory negligence at least in the sense of failure to discover a defect or to guard against its existence, is not a defense to products liability actions based on breach of warranties. See, 1 Hursh, supra, § 3.9 at p. 416 (Supp.1972); Noel, supra, 25 Vand.L.Rev. at 113–114; Comment, Products Liability: for the Defense-Contributory Fault, 33 Tenn.L.Rev. 464, 465–466 (1966); Annot., 4 A.L.R.3d 501 (1965); Texsun Feed Yards, Inc. v. Ralston Purina Co., 447 F.2d 660 (5th Cir. 1971); Rossi, E. M., Contributory Negligence as a Defense in a Products Liability Suit to Recover Economic Loss, 38 Ins. Counsel J. 629 (1971).

Appellants argue that the respondents failed to follow directions or warnings on the label or in the pamphlet. Although the record shows that the respondents totally disregarded any instructions concerning climatological or soil conditions, apparently they mixed and applied the Sinox PE in the correct proportions. Also, it is difficult to determine whether respondents violated any of the climatological warnings. Although several heavy periods of rain fell during. the time and after the respondents sprayed their mint crops, the total precipitation at any one time did not exceed the danger level for application of Sinox PE. However, during May, 1967, the temperature exceeded the danger point for the application of Sinox PE on several days. From the weather station at Boise, the temperature rose above the danger point on May 17, 21, and 22, while the temperature at the Caldwell station was above the critical point on May 16, 17, 18, 20, 21, 22 and 23. In contrast, the month of April was entirely compatible with spraying Si-

nox PE. In relation to the above dates respondent Henderson began spraying in "the forepart of April" and stopped in the middle of May; respondent Olsen finished around April 24 or 25. Except for an undetermined portion of respondent Henderson's mint the respondents apparently sprayed their crops according to the climatological warnings in spite of their failure to read written instructions.

Finally, both respondents used the same spraying equipment to apply Sinox PE. Because of this common use appellants hypothesize that the equipment was either contaminated or improperly calibrated which accounts for their common loss. There, however, is no evidence in the record to substantiate either hypothesis.

[3] █ appears that the respondents mixed the herbicide in the correct proportions and applied it accordingly. In this case it is as equally probable as not that the respondents applied the herbicide properly. For this reason the appellants have not sustained their burden of persuasion and produced substantial evidence of contributory negligence as a defense. See, Riley v. Larson, 91 Idaho 831, 432 P.2d 775, 42 A.L.R.3d 1274 (1967).

## ACTUAL CAUSE

[4] considered whether respondents were contributorially negligent by misusing the herbicide, we turn to the issue of actual cause. Actual cause has often been confused with proximate causation. The significance of proximate cause focuses upon legal policy in terms of whether responsibility will be extended to the consequences of conduct which has occurred. Prosser, Handbook of The Law of Torts, §§ 41, 42 (4th ed. 1971). Actual cause, however, is a factual question focusing on the antecedent factors producing a particular consequence. See, generally, Malone, W. S., Ruminations on Cause-In-Fact, 9 Stanford L.Rev. 60 (1956); Green, L., The Causal Relational Issue in Negligence Law, 60 Mich.L.Rev. 543 (1962). In this case there is a question whether the

Sinox PE, in fact, caused the respondents' crop damage.

■■ The respondents rely on circumstantial evidence to prove Sinox PE as the actual cause of their loss. The appellants contend that respondents' proof is insufficient to establish Sinox PE as the causative agent. In reviewing the record on the issue of actual cause our inquiry will be into the competence of the evidence. Conflicts in the evidence and conflicts in the conclusions to be reached from the evidence remain questions for the trier of facts. Ripatti v. Ripatti, 94 Idaho 581, 494 P.2d 1025 (1972); Cargill v. Hancock, 92 Idaho 460, 444 P.2d 421 (1968); Tippets v. Gem State Mut. Life Ass'n, Inc., 91 Idaho 91, 416 P.2d 38 (1966).

■ In view of the appellants' motions for an involuntary dismissal, directed verdict and judgment n. o. v., made at the appropriate stages in the trial contesting the respondents' proof of causation, we must view the evidence and all reasonable inferences most favorably for the parties against whom the motion is made. See, Curtis v. Dewey, 93 Idaho 847, 475 P.2d 808 (1970); Fawcett v. Irby, 92 Idaho 48, 346 P.2d 714 (1968). See also, Dent v. Hardware Mut. Cas. Co., 86 Idaho 427, 388 P.2d 89 (1963); 9 Wigmore on Evidence, § 2494, p. 299 (3d ed.); See generally, Prosser, Handbook of The Law of Torts, § 41, p. 241–244 (4th ed. 1971). As in all such cases questioning the sufficiency of the evidence, the record must be reviewed to determine whether there is competent evidence to sustain the verdict; and if the litigant's case is one based on circumstantial evidence, whether such circumstantial evidence and reasonable inferences to be derived from the circumstantial evidence sustain the verdict. In Splinter v. City of Nampa, 74 Idaho 1, 256 P.2d 215 (1953), this Court stated:

"Circumstantial evidence is competent to establish negligence and proximate cause. Facts, which are essential to a liability for negligence, may be inferred from circumstances which are estab-

lished by evidence. But, where circumstantial evidence is relied upon, the circumstances must be proved, and not themselves be left to presumption or inference (citations). * * *.

"The underlying principle applicable here is that a verdict cannot rest on conjecture; that where a party seeks to establish a liability by circumstantial evidence, he must establish circumstances of such nature and so related to each other that his theory of liability is the more reasonable conclusion to be drawn therefrom; and that where the proven facts are equally consistent with the absence, as with the existence, of negligence on the part of the defendant, the plaintiff has not carried the burden of proof and cannot recover." 74 Idaho at 10, 256 P.2d at 221.

■ Whether a cause of action is based on warranty, negligence, or strict products liability, the plaintiff has the burden of alleging and proving that (1) he was injured by the product, (2) the injury was the result of a defective or unsafe product, and (3) the defect existed when the product left the control of the manufacturer. Prosser, Handbook of the Law of Torts, § 103 at pp. 671–672 (4th ed. 1971). See, Note: Products Liability: Methods of Pleading and Proof for the Plaintiff, 49 N.Dak.L.Rev. 105, 106 (1972). In this appeal causation in fact is relevant both to the implied and express warranty counts against Cominco and the negligence count for failing to test the product against FMC.

Appellants FMC and Cominco first claim respondents' testimony concerning causation was incompetent. This claim challenges the competency of any testimony from respondents Henderson and Olsen concerning causation by contesting the validity or, alternatively, the applicability of Bean v. Diamond Alkali Co., 93 Idaho 32, 454 P.2d 69 (1969). However, the respondents contend that there is sufficient evidence in the record to establish causation *without* relying on expert testimony

from respondents as farmer experts under the *Bean* rationale.

In Bean v. Diamond Alkali Co., supra, farmers with long experience in onion growing, over objection, were allowed to express their opinion that damage to onion crops was caused by chemical action of the herbicide employed. The majority of the court held that the trial court had wide discretion in determining whether witnesses were qualified to testify on such matters, and whether under the facts of that case there was no error in allowing such testimony. The appellants urge that the *Bean* holding is incorrect or alternatively that the respondents in this case do not qualify as farmer-experts.

The appellants' point, that the respondents do not qualify as farmer-experts in this case, is well taken. It is clear that the respondents were novices in the application of herbicides to mint. In fact, Henderson had employed nonchemical methods of weed control until 1967. Also, Henderson had grown mint for only six years while Olsen planted his first crop in 1967. Finally, it is clear in the record that neither Henderson nor Olsen knew or understood precisely its chemical properties or the effect of Sinox PE upon application.

However, the appellants have not referred the court to any of the respondents' testimony concerning causation of the crop damage. A perusal of the record with one exception reveals no testimony of respondents about causation. First, during their case the respondents testified in detail only about plainting peppermint and applying the Sinox PE to their crop. They described the appearance of the dying mint plants. They also stated explicitly the extent of their crop failure. Respondents never attempted at any time to elicit any testimony concerning causation. While inferences about causation of respondents' injury may be drawn from this testimony, there are no direct statements concerning causation prompted by respondents. Second, nowhere in the record are there objections to the alleged testimony raising the Bean v. Diamond Alkali Co. case. Third, the appellants themselves explicitly raised the issue of causation during the cross-examination of the respondents.[2] Quite interestingly, respondents during this cross-examination admitted having no knowledge of the cause of injury. These admissions, it appears, actually aided the appellants. Finally, appellants emphasize that the trial court would have granted their motion for involuntary dismissal had the trial court not been obligated to follow the Bean v. Diamond Alkali Co. case. This contention is neither useful nor entirely correct. Again there are no references to testimony about *cause in fact*. Also the trial court stated that there were sufficient inferences of causation independent of the phantom *Bean* testimony, for the case to go to the jury. Because of

---

2. "[Appellants' counsel] Q. Is there anything you can give as a possible cause for the loss or partial loss of your mint crop? [Mr. Henderson] A. Well, you want me to really do that?
Q. Do you have any chemical explanation for it? Do you know what the chem—
A. No. I have no idea. I have thought in my mind what it did, I think it killed it.
Q. You don't know why?
A. No. I don't know why.
 * * * * *
[Appellants' counsel] Q. Do you know [herbicide 2–4d] translocates through the plant to the roots?
[Mr. Olsen] A. Yes.
Q. Does Sinox do that?
A. It did in this case.
Q. How do you know it did in this case?

A. You could see the beginning of it.
Q. Sinox PE has a yellow look?
A. Yes.
Q. Did the roots turn yellow?
A. No.
Q. Do you know how the Sinox went into the roots?
A. When its killing it doesn't. The stuff, it doesn't go into the inside of the plant where you can see the brown or yellow.
Q. How do you know it went into the roots?
A. Because they were dead.
Q. You don't, do you? You don't know it went into the roots, do you?
A. No.
Q. You don't have the foggiest notion except the roots were dead.
A. When the others didn't use it, they lived. Why? What else could we assume?"

the preceding examination of the record we now turn to the one instance of respondents' testimony related to the issue of causation.

■ At the outset of their case respondent Henderson testified that he had applied a test herbicide, "Sinbar" to one and one-third acres of peppermint. This test plot was in the middle of the thirty-seven acre field which had been sprayed twice with Sinox PE. Appellants objected to the materiality and relevancy of this testimony. After counsel argued, outside the jury's presence, on the admissibility of the testimony, the district court admitted it on the issue of causation. Then respondent Henderson testified about the bountiful crop yield and the effectiveness of the weed control on the "Sinbar" plot. He also stated that the "Sinbar" had no effect on the mint plants or roots. Immediately following these statements respondent Henderson testified about the effects of Sinox PE on the thirty-seven acre field:

"[Respondents' counsel] * * * What did you see after that first application? [Henderson] Well, we seen the weeds, was still emerging from the ground and we see the peppermint was dying down. As it was emerging it was dying out.

* * * * * *

[Respondents' counsel] And when did you make the second application?

A. It would be the latter part of April after we found out the first application was not going to be effective to us.

Q. During this period of time, did you buy any more Sinox PE from Crop-Serv?

A. We bought some for the second application and then we bought some later on for the rest of the place.

Q. Did you apply Sinox PE to the remainder of your field?

A. Yes.

Q. Did you notice any results during this application that concerned you?

A. Very much so. We didn't get much results.

Q. Describe what happened, after the application to your entire field, what it looked like?

A. Well, the peppermint was dying and the weeds was still growing.

Q. What about the peppermint roots?

A. The roots was turning brown and they were dying out."

The testimony about "Sinbar" appears in a context in which there is an irresistible inference that Sinox PE caused the damage. That is, the field on which "Sinbar" had been sprayed produced an excellent yield of mint with good weed control and the fields sprayed with Sinox PE produced diminished yields, therefore Sinox PE was the cause of the injury. This syllogism is dubious. The chemical nature and properties of "Sinbar" are unknown. The respondent failed to lay any foundation identifying the propensities of "Sinbar," its method of application, or its time of application. Also, the record indicates that "Sinbar" was a test product in 1967 when respondent applied it. Although "Sinbar" became marketable in 1968, there is no evidence that it was chemically identical or even related to the product used in 1967. Notwithstanding that Henderson is a novice with mint herbicides, there is no foundation of facts necessary to qualify "Sinbar" as relevant to this case. The district court erred in allowing this testimony without a proper foundation; in light of the preceding discussion there is no reason to consider the farmer-expert issue in Bean v. Diamond Alkali Co., supra.

The primary issue is whether the respondents adduced sufficient circumstantial proof of causation in fact for the case to go to the jury. Appellants contend that there is neither proof of causation nor proof of any defect with Sinox PE. Respondents insist that the absence of injury to other mint crops not sprayed with Sinox PE proves that Sinox PE was, in fact, the causative agent, and they exclusively rely on this as proof of causation.

A summary of respondents' evidence concerning the absence of injury to other

mint crops is useful. First, Laverne Larsen, one of the original plaintiffs, applied Sinox PE to all his mint crop except one-half acre. The one-half acre flourished while the rest died. Second, Ed Schwisow, respondents' neighbor, harvested a good yield of mint except for five barren acres. Schwisow did not use Sinox PE. Third, Robert Friday, Appellants' witness, grew a good crop of mint in 1967, but he did not use Sinox PE either.

In reviewing this evidence the first question for consideration is whether the non-occurrence of other injuries is competent proof of causation *in this case*. Second, we must consider in this case whether proof of injury alone allows a permissible inference of causation, and third, whether there is proof of a defect in the Sinox PE.

▇▇▇▇▇▇ In both negligence cases and warranty actions reasonable inferences may be drawn in connection with causation from circumstantial evidence. Prosser, Handbook of The Law of Torts, § 39 (4th ed. 1971). See, 1 Hursh, American Law of Products Liability, § 1.21 et seq. (1961); Note: Circumstantial Evidence in Strict Products Liability Actions, Wash.Univ.L. Q., 804 (1972); 1 Frumer and Friedman, Products Liability, § 11.01 et seq. (1972). Also, causation may be proved by the occurrence or nonoccurrence of injury in similar circumstances. 2 Frumer and Friedman, Products Liability, § 16.03[4] ii, iii (1972); 1 Hursh, American Law of Products Liability, §§ 1.23, 1.24 (1961). In cases using non-occurrence of injury as a mode of proof, the product alleged to be the causative agent *had been used or consumed* in those instances evidencing the presence or absence of injury. Here, the converse is true: Sinox PE was *never applied* to the fields which produced good mint yields.

▇▇▇▇▇ To infer Sinox PE was the causative agent because other crops not sprayed with Sinox PE flourished is speculative. There are too many variables in agricultural practices among the respondents and their witnesses to conclude that differences in crop yields were due solely to the application of Sinox PE. Except for cursory statements by Ed Schwisow about the similarity between his farming practices and the respondents' and Larsen's there is scant evidence concerning the method and frequency of watering, soil characteristics, age of peppermint and type and frequency of cultivation. Robert Friday never testified about any of these variables. On the basis of these variables the crop yields suggest an *equally probable* inference that it was the nature of the farming methods, soil and water conditions, or even disease which caused the injury rather than Sinox PE.

Next we must consider whether from proof of injury causation may be inferred. Several questions arise concerning the uniformity of damage which are equally applicable to the succeeding discussion concerning proof of a defect. Respondent Henderson sprayed one 37 acre field twice with Sinox PE, yet that field produced a harvestable, although diminished, quantity of mint while other fields sprayed once were ravished. Respondents would have the Court believe that Sinox PE selectively killed portions of the respondents' crops, while on the other hand, it failed to control the infestation of weeds. For example, respondent Henderson harvested 95 acres out of 170, while respondent Olsen harvested 5 acres out of 13 without any explanation why some mint escaped the alleged devastating effect of Sinox PE.

▇▇▇▇ Although portions of the respondents' mint crops perished, there is no rational explanation for the difference between the amount of mint acreage sprayed with Sinox PE and the amount which actually died. To infer that Sinox PE was the cause of the injury on the basis of this evidence would be speculative and unreasonable. At best, it is as equally probable as not that the devastated mint crops resulted from the application of Sinox PE.

▇▇▇▇ Next we must consider whether the injury occurred because Sinox PE was defective and whether the defect existed when it left the hands of the manufacturer. Prosser, Handbook of the Law of

Torts, § 103, p. 672 et seq. (4th ed. 1971). In this record the only evidence of a defective product is by inference from the fact of injury. However, this inference is unreasonable, since Sinox PE cannot be identified as the causative agent. There is no competent evidence in the record that the Sinox PE was defective. In fact, the respondents never attempted to discover the cause of their injury or to identify a defect in the Sinox PE. At no time subsequent to their injury did the respondents ever have their damaged crops analyzed or tested. Finally, there is no direct evidence in the record that the Sinox PE was defective when it left the appellants' control.

The respondents had the burden of proving the elements of their warranty and negligence action with a preponderance of evidence. Like many negligence cases the respondents relied on circumstantial evidence to establish those elements. See, Dent v. Hardware Mut. Cas. Co., 86 Idaho 427, 388 P.2d 89 (1963). In this case the element of actual cause was an element common to both warranty and negligence actions. The appellants moved for involuntary dismissals, directed verdicts, and judgment n. o. v. at the appropriate times throughout the trial. In each motion the appellants raised the issue of causation stating that the respondents had not sustained their burden of proof. We agree. After reviewing the evidence, inferences, and conclusions we hold that there is no rational, competent, basis in the record showing that: (1) Sinox PE was the cause of the injury, (2) it was defective, or (3) it was defective when it left the control of the appellant.

The judgment is reversed. Costs to appellants.

DONALDSON, C. J., and McQUADE and SHEPARD, JJ., concur.

BAKES, J., dissents.

On Petition for Rehearing

On Objections to Memorandum of Costs

Appellants filed their memorandum of costs and disbursements with the clerk of this court, including therein not only their costs attendant to the appeal to this court, but also costs they incurred in the trial court. Respondents filed their objections to the memorandum of costs by appellants.

Respondents' objections to the costs on this appeal are premised upon the fact that appellants included in their memorandum of costs annual disbursements made for bond premiums. Respondents' objections to costs incurred in the trial court is twofold, i. e. that costs incurred in the trial court must be assessed by that court, and that particular items contained in the memorandum of costs were improperly included.

Costs on Appeal

The right to recover costs is statutory. Harrison v. Pence, 79 Idaho 377, 318 P.2d 1096 (1957); Cole v. Cole, 68 Idaho 561, 201 P.2d 98 (1948).

Applicable statutes are I.C. § 12–114 and I.C. § 41–2607.[1] In furtherance of the provisions of I.C. § 12–114, this court has adopted rules concerning the allowance of costs on appeal. Supreme Court Appellate

---

1. "12–114. Taxation of costs on appeal in Supreme Court.—Whenever costs are awarded to a party by an appellate court, if he claims such costs he must tax the same before the clerk of the Supreme Court, subject to exception and review by the Supreme Court or the judges thereof, within such time and subject to such regulations as the Supreme Court shall by rule direct, and the same when taxed shall be certified by the clerk of the Supreme Court to the clerk of the court from which the appeal was taken, to be there entered as a judgment and to be enforced by execution as in the case of other judgments."

"41–2607. Bond premiums as part of costs in actions and proceedings.—In all actions and proceedings a party entitled to recover disbursements therein shall be allowed and may tax and recover such sum paid a surety insurer authorized under the laws of this state to do so for executing any bond, recognizance, undertaking, stipulation or other obligation therein, not exceeding, however, one percent (1%) on the amount of the liability upon such bond, recognizance, undertaking, stipulation or other obligation during each year the same has been in force."

Rule 40 (see Idaho State Bar Desk Book) provides in pertinent part:

> "Costs may include statutory filing fees, cost of transcript, *bond premiums* and cost of printed brief * * *." (Emphasis added.)

■ Appellants in their memorandum of costs sought to recover the total amount of annual premiums paid for the cost of bonds on this appeal. In perfecting this appeal, appellants filed one instrument, which included an undertaking on appeal (I.C. § 13–203) and also a supersedeas undertaking on appeal (I.C. § 13–204). Under the provisions of I.C. § 41–2607, the amount appellants may recover for their disbursements to the surety for the bond are limited to one percent (1%) "on the amount of the liability upon such bond * * * during each year the same has been in force."

The clerk of this court shall compute the correct amount due in accordance with the uncontested items of the appellants' memorandum of costs and disbursements, and in accordance with the views expressed herein, and certify the costs for the appeal and supersedeas bonds to the clerk of the district court to be entered there as a judgment in accordance with the provisions of I.C. § 12–114.

### Costs in District Court

■ Appellants incorporated in their memorandum of costs and disbursements filed in this court items they claim to be due to them as costs incurred in the lower court. Respondents contend that this procedure was improper, arguing that only costs incurred on the appeal may be included in the memorandum of costs and disbursements before this court. Under the provisions of I.C. § 13–221, as implemented by Supreme Court Appellate Rule 45 (Idaho State Bar Desk Book), upon rendition of an opinion the judgment in the lower court does not become final until after the expiration of twenty days, provided a petition for rehearing has not been filed. If a petition for rehearing is filed, upon denial of that petition, judgment is to be entered forthwith. Under I.C. § 12–113 [2] the appellants will have five days following denial of the petition for rehearing within which to file costs they claim in the lower court. Concerning the particular items of cost that may be claimed in the district court, correctness of those items is in the first instance for resolution by the trial court.

2. "12–113. Taxation of costs.—The party in whose favor the judgment is rendered and who claims his costs, must within five days after the verdict or notice of the decision of the court or referee, file with the clerk, and serve upon the adverse party or his attorney, a copy of a memorandum of the items of his costs and necessary disbursements in the action or proceeding, which memorandum must be verified by the oath of the party or his attorney or agent, or by the clerk of his attorney, stating that to the best of his knowledge and belief the items are correct and the disbursements have been necessarily incurred in the action or proceeding.

"A party dissatisfied with costs claimed may within five days after the service upon him of the copy of the memorandum, file and serve upon the adverse party or his attorney, a notice of a motion to have the same taxed by the court in which the judgment was rendered, or by the judge thereof at chambers."