765 P.2d 667

**Arnold D. LUNDSTROM, Individually; Geraldine Lundstrom, Individually; Peggy Lundstrom Sanchez, Individually; and Arnold D. Lundstrom, as guardian ad litem and next friend of Kim Lundstrom, a minor child, and Jessica Sanchez, a minor child, Plaintiffs–Appellants,**

**and**

**Arnold D. Lundstrom, as guardian ad litem and next friend of Crystal Sanchez, a minor child, Plaintiff,**

**v.**

**BREKKE ENTERPRISES, INC., a corporation; Wayne Cottle, dba Merlin's Insulation of Pocatello; John Does One Through Five, dba Merlin's Insulation of Pocatello; John Doe Corporations One Through Five; John Doe Companies One Through Five; John Does One Through Five, Defendants–Respondents.**

**No. 15595.**

Supreme Court of Idaho.

Oct. 26, 1988.

Rehearing Granted March 17, 1988.

Hansen, Beard, Martin & St. Clair, Ctd., Idaho Falls, and S. Brook Taylor (argued), Port Angeles, Wash., for plaintiffs-appellants.

Racine, Olson, Nye, Cooper & Budge, Pocatello, for defendant-respondent Brekke. William D. Olson, argued.

Quane, Smith, Howard & Hull, Boise, for defendant-respondent Cottle. Alan K. Hull, argued.

SHEPARD, Chief Justice.

This is an appeal from an order of the district court denying plaintiffs-appellants' motion for a judgment n.o.v., or in the alternative, for a new trial in a products liability action in which the jury had returned a verdict for the defendants. We affirm.

In 1978 plaintiffs-appellants Lundstrom contacted Merlin's Insulation relative to providing additional insulation in the Lundstrom home. Brekke furnished Merlin's with the ingredients and equipment necessary to produce "Key" foam at the job site. The insulation work was completed by Merlin's in August of 1978. The Lundstroms testified that they and their family members experienced a variety of medical complaints thereafter, but they continued living in the home until December 1979. At that time they saw a television program relating to alleged adverse health effects caused by the emission of formaldehyde from urea formaldehyde foam insulation such as was installed in the Lundstrom home. The Lundstrom family then moved out of their home. This action was filed alleging that members of the Lundstrom family had suffered permanent physical and mental im-

pairment caused by the emission of formaldehyde gas from the urea formaldehyde foam insulation. Following a two-week trial the jury returned a verdict for the defense, and in a special verdict form specifically found that the insulation as installed by Merlin's Insulation was safe.

On this appeal Lundstroms raise a number of issues which may be summarized as asserted errors by the trial court in either admitting or denying the admission of certain documentary evidence, in refusing certain of plaintiffs' requested instructions, and the submission of allegedly erroneous instructions to the jury.

■ Lundstroms assert error in the admission of defendants' Exhibit 1A (the Reitan letter). Reitan is asserted to have been a world renown authority in the field of neuropsychology. One of plaintiffs' expert witnesses, Hildebrandt, a psychologist, had been deposed prior to trial. During the course of his deposition he indicated that he had examined members of the Lundstrom family, subjected them to various tests, and had consulted authorities. Based thereon he concluded that members of the family had suffered brain damage. He testified he had solicited assistance from Dr. Reitan, and had received a letter from Reitan. Hildebrandt was questioned as to the contents of the Reitan letter, and a copy of that letter was attached to his deposition. Dr. Baker was an M.D. specializing in allergies, and testified on behalf of the Lundstroms at trial. He was asked as to the causation of the alleged problems of the plaintiffs, but an objection thereto was sustained. Thereafter, in proceedings *in limine*, the district judge indicated that while Baker lacked sufficient foundation and expertise to testify as to causation, if Baker were to review and consider the testimony in the Hildebrandt deposition, sufficient foundation might then exist upon which Baker could testify as to causation. Thereafter, Baker did review the testimony in the Hildebrandt deposition and utilized such as foundation to testify as to causation and sensitization and brain damage. Baker was cross-examined as to his review of, and reliance upon, matters in the Hildebrandt deposition, a part of which was the Reitan letter. Baker testified he had never seen the Reitan letter. It was during that cross-examination for purposes of impeachment of Baker, that the Reitan letter (defendants' Exhibit 1A), was offered and admitted as an exhibit. The trial court stated:

I refused to allow Dr. Baker to testify as to causation and actually sensitization and other matters because of his, at that time, at least, he had not examined these individuals himself.... And then you'll remember at a pretrial you indicated that, at that point in time, Dr. Baker had not seen the deposition of Dr. Hildebrandt.... I indicated to you that if Dr. Baker were to use the deposition of Dr. Hildebrandt as the basis for his subsequent opinions, that I would subsequently reverse myself, ... and the only reason I allowed Dr. Baker to testify at all is because he said, in his foundation here, that he relied on the deposition of Dr. Hildebrandt completely as a basis for his then ability to testify as to not only causation, but sensitization, brain damage, medical opinions.

Now this letter that was admitted as defendant # 1 Exhibit A was a part of that deposition. He testified on the stand he had never seen it until that day. And yet, he testified earlier that he relied upon the entire deposition of Dr. Hildebrandt as a basis for my admission of the testimony that I'd allowed him to give. So I admitted it on the basis of a part of that deposition that he supposedly relied on. Admittedly he didn't.

And certainly it's a grounds for—I think these defendants are entitled to put before this jury something that he said he relied upon, or was a portion of what he said he relied upon, and then admitted on the stand that he had never seen. And I think it's for impeachment purposes alone that it's admissible.

In his testing, Hildebrandt had used the Halstead–Reitan Battery of Neuropsychological Tests, which had been developed in part by Dr. Reitan. Hildebrandt testified that he had consulted with other authorities, including Dr. Reitan. He produced at

his deposition a letter written to him by Dr. Reitan. That letter was attached to his deposition, presumably as impeachment material. Dr. Baker testified that he had relied upon the Hildebrandt deposition, but testified that he had never seen the Reitan letter. We deem it clear that the defense was entitled to produce the Reitan letter at trial as a method of impeaching the testimony of Baker. Under the peculiar and unusual circumstances we hold that the trial judge did not abuse his discretion in admitting the Reitan letter.

The Lundstroms next assert that the trial court erred in refusing to admit certain of the plaintiffs' exhibits at trial. We note initially that the focus at trial of the instant case was the assertion that plaintiffs family members had suffered brain damage attributable to formaldehyde gas escaping from the foam insulation. None of the tendered exhibits relate to or discuss brain damage.

Tendered Exhibit 7 was an article in the *Journal of the American Medical Association* entitled "Toxicology of Urea Formaldehyde and Polyurethane Foam Insulation." It indicates that "long term consequences of domestic formaldehyde exposure have not been adequately studied ... studies of toxicity from urea formaldehyde foam insulation are urgently needed." Exhibit 7 was first tendered during the testimony of plaintiffs' witness Breysee, but was withdrawn when that witness indicated he had never seen the article. Exhibit 7 was next tendered during the testimony of plaintiffs' witness Ostler who had testified that he had no expertise in toxicology, chemistry or sensitization. The exhibit was at that time refused admission for lack of foundation. Exhibit 7 was again tendered during the testimony of plaintiffs' witness Rogers who indicated that the exhibit was not a basis for his opinion, following which the exhibit was again refused admission.

Exhibits 15, 16 and 17 were entitled "Symptom Survey of Residents of Homes Insulated with Urea Formaldehyde Foam," "Formaldehyde Levels in the Air of Houses Containing Urea Formaldehyde Foam Insu-

lation," and "The Health Implications of Urea Formaldehyde Foam Insulation," respectively, and were tendered during the testimony of plaintiffs' witness Hildebrandt, the psychologist. Hildebrandt was not a medical doctor and had demonstrated no expertise in the area of chemistry, toxicology or sensitization. The court did not admit Exhibits 15, 16 and 17, but rather reserved a ruling thereon. Ultimately those exhibits were refused admission by the trial court on the basis of a lack of foundation, the court noting that no authoritative status of the exhibits had been established, nor had there been any testimony as to the expertise of any of the authors of the exhibits.

Exhibit 15 is the report of three people who are identified only by name, and none of whom are identified as having any expertise in any field. It is the reporting of a telephone survey which include caveats that telephone interviews are intrinsically imprecise; that no monitoring for formaldehyde could take place because of the retrospective nature of the study; that statistical analyses of symptom reporting may be influenced by factors other than foam exposure, and that publicity about adverse health effects of the foam could promote overreporting of symptoms. The survey concluded: "... this study demonstrates that in the population surveyed there was no broad based epidemic of allergic or irritative symptoms referable to the UF foam."

Tendered Exhibit 16 is a "limited survey" to determine levels of formaldehyde gas which "has been reported to be present in automobile emission and cigarette smoke, and to be emitted from permanent press fabrics, plywood and particle board and urea formaldehyde foam insulation." The tendered exhibit concluded, "This survey indicates that high level of formaldehyde are not present in the air of houses in Ontario which have been insulated with UFFI."

Tendered Exhibit 17 purports to deal with health implications of urea formaldehyde foam insulation, but concludes only "it would be difficult at present to attribute

any risk to formaldehyde exposure at 0.1 ppm." The exhibit indicates that formaldehyde results from emissions from automobile exhausts, cigarette smoking, fireplaces, gas cooking stoves and heating appliances, and that locations near industry and busy highways can affect ambient indoor levels. It notes that insulation can result in the build up of other ambient gases such as sulphur dioxide, mercaptains, nitrogen oxides, ozone and carbon monoxide which produce many symptoms similar to those resulting from formaldehyde, and "unfortunately there are no studies on homes insulated with UFFI in which the other gases were measured as well as the formaldehyde." Another caveat noted was that formaldehyde is highly utilized in laboratory processes, and that pathologists and laboratory technicians have a higher than average exposure to formaldehyde, but such persons do not appear to suffer injury therefrom.

In sum, there is no showing that any of the exhibits relate to the issue in the instant case, *i.e.*, a relationship between the escape of formaldehyde gas from foam insulation, and brain damage. None of the exhibits were authenticated as sufficiently reliable, nor were they the basis for the opinions of the plaintiffs' expert witnesses. The content of the exhibits themselves indicates only speculation and the necessity for additional study, and hence if the admission of the tendered exhibits was error, it was harmless error.

■ Lundstroms next assert that the trial court erred by refusing to allow plaintiffs' medical experts to render opinions as to the relative safety of the foam insulation. We do not agree, and hold such assertion is not supported by the record.

Dr. Baker, a physician-allergist, was allowed to testify that the Lundstrom family members manifested a heightened sensitization due to long-term exposure to formaldehyde in their living environment, and that their symptoms were typical of formaldehyde syndrome patients. Because of the lack of a proper foundation, Dr. Baker was not permitted to testify as to a causal connection between home insulation and the symptoms of the Lundstrom family. He was shown to lack any knowledge of the levels of formaldehyde or the duration of exposure required to cause such sensitization. Dr. Rogers was a physician specializing in respiratory and internal medicine, and gave an expert opinion as to the observed symptoms of the Lundstrom family members, and opined that the symptoms were caused by exposure to formaldehyde. Hildebrandt, the psychologist, was allowed to testify that brain impairment existed in the family members, and opined that the permanent impairment was caused by exposure to urea formaldehyde insulation which led to formaldehyde gas in the Lundstrom home. Ostler, a family physician, testified as to the symptoms of the Lundstrom family members, but was not allowed to opine as to any causal connection due to his lack of expertise. Breysee, a retired professor of industrial hygiene, specializing in the study of chemical and physical hazards, had no knowledge of, and hence was not allowed to testify, as to the condition of the Lundstrom family members. However, he was allowed to testify that formaldehyde levels in the Lundstrom home were higher after the insulation installation, and that the insulation product was unsafe.

Hence, we conclude that the Lundstroms were afforded an adequate opportunity to present expert testimony regarding their theory of the case, and any testimony rejected was properly excluded on the basis of an inadequate foundation. We find no error.

■ Lundstroms assert that the trial court erred in giving jury instructions Nos. 7 and 8, and argue that such instructions emphasized the court's rulings which sustained objections to some of the testimony of plaintiffs' expert witnesses on the basis of lack of foundation. Lundstroms also argue that the instructions inaccurately stated the plaintiffs' burden of proof. We do not agree. As herein stated, the rulings of the trial court as to lack of foundation for certain of the plaintiffs' expert testimony was correct, and has been affirmed. Instruction No. 7 merely informed the jury

that it must resolve any conflict between the testimony of expert witnesses, and in so doing should consider the relevant qualifications and credibility of the witnesses. That instruction only reiterated jury Instruction No. 2 which set forth the general standards for weighing evidence and determining credibility of witnesses. While a specific instruction on weighing expert testimony may not be always advisable, *see* IDJI No. 24, comments, nevertheless the record demonstrates that in the instant case there was a literal battle of expert opinion which the jury was required to resolve. We hold that jury Instruction No. 7 did not militate in favor of either plaintiffs or defendants, was well within the discretion of the trial court, and that discretion will not be disturbed on appeal.

■ The Lundstroms argue that jury Instruction No. 8 contained an overstatement of the plaintiffs' burden of proof. We disagree. That instruction only required that the issue of causation be established "with reasonable probability, not mere possibility," which we hold correctly stated the plaintiffs' burden of proof in a products liability, *i.e.*, by a preponderance of the evidence. *Henderson v. Cominco American, Inc.*, 95 Idaho 690, 518 P.2d 873 (1973). Here, the instruction correctly stated that the proof required was more than a mere possibility that the insulation caused the damage to the Lundstroms.

■ The Lundstroms argue that a host of other instructions given to the jury were also erroneous, and contend variously that the instructions caused the jury to discount certain of the plaintiffs' expert testimony, drew undue attention to particular elements of plaintiffs' burden of proof, improperly suggested the possibility of preexisting conditions as a mitigating cause or sole cause of injury, and that the cumulative nature of the instructions created a prejudicial effect on plaintiffs' case. We disagree. Some of the instructions complained of by the Lundstroms concerned damages, which error if any is moot in light of the jury finding that the product did not cause injury to the Lundstroms. As to the remainder of the given instruc-

tions, we hold that they fairly and correctly stated the law.

■ The trial court's Instruction No. 2 advised the jury, "Your duties are to determine the facts, to apply the law set forth in these instructions to those facts, and in this way to decide the case. In so doing you must follow these instructions. *You must consider them as a whole*, not picking out one or disregarding others." (emphasis added). As stated in *McBride v. Ford Motor Co.*, 105 Idaho 753, 760, 673 P.2d 55, 62 (1983): "On appeal the instructions must be viewed as a whole to determine whether the jury was properly and adequately instructed. (Citations omitted.) If the court's instructions, considered as a whole, fairly and accurately present the issues and state the applicable law, then no error is committed." As noted, we hold that the jury was accurately and fairly instructed, and when read together, fairly and accurately present the issues and state the applicable law. We find no error.

■ Since we have held that the jury instructions given by the trial court were correct, accurately and fairly stated the issues, and accurately stated the applicable law, we need not consider Lundstroms' asserted error in the trial court's failure to give certain of plaintiffs' requested instructions. It is sufficient to say that we have reviewed the argument pertaining to each of plaintiffs' requested instructions, and find no error in the refusal of the trial court to give the same.

■ Lundstroms also assert that the trial court erred in the use of the special verdict form. That special verdict form did nothing more than ask the jury to determine if the foam insulation installed in plaintiffs' house was defective or unsafe at the time it left the control of the defendants. That special verdict form question conforms to the law as construed in *Henderson v. Cominco American, Inc.*, *supra*, wherein the Court stated: "[T]he plaintiff has the burden of alleging and proving (1) he was injured by the product, (2) the injury was the result of a defective or unsafe product, and (3) the defect existed when the product left the control of the

manufacturer. (Citations omitted.)" We find no error.

■ Finally, we address the Lundstroms' assertion that the trial court committed error in its failure to dismiss one of the jurors. We have reviewed the voir dire examination of the particular juror wherein he was queried as to past attorney/client relationship with counsel involved in trial of the instant case. The trial court ruled that the juror had no ongoing business relationship with legal counsel involved at trial. We further note that plaintiffs did not at trial challenge the juror for cause, nor was the juror the subject of a peremptory challenge. The record does not disclose that plaintiffs' peremptory challanges had been exhausted.

In view of our discussion of the issues raised on appeal, most of which were the subject of the Lundstroms' motion for a judgment n.o.v. or in the alternative a new trial, we find no abuse of discretion in the orders of the trial court denying the motion for a judgment n.o.v. or a new trial.

■ It is well settled that a trial court has broad discretion to grant a motion for a new trial if it believes that the jury verdict is not in accord with law or justice. *Seppi v. Betty*, 99 Idaho 186, 579 P.2d 683 (1978). *See also Sheets v. Agro–West, Inc.*, 104 Idaho 880, 664 P.2d 787 (Ct.App.1983). In the instant case there is ample evidence to support the jury verdict, and we find no abuse of the trial court's discretion in its refusal to grant a new trial.

A motion for a judgment n.o.v. is judged on a more rigorous standard than is a motion for a new trial, *Sheets v. Agro–West, Inc., supra,* and a judgment n.o.v. will not be granted if there is substantial evidence of "sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper." *Smith v. Great Basin Grain Co.*, 98 Idaho 266, 274, 561 P.2d 1299, 1307 (1977) *quoting Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 518 P.2d 1194 (1974). Since there was substantial competent evidence to support the jury verdict in the instant

case the trial court did not err in denying the motion for judgment n.o.v.

We have reviewed plaintiffs-appellants' remaining assertions of error and find them to be without merit. The judgment of the trial court is affirmed. Costs to respondents; no attorney fees allowed.

McQUADE and McFADDEN, JJ. Pro Tem., concur.

JOHNSON, Justice, concurring and dissenting.

I concur with the majority opinion, except as to the admission of the Reitan letter. In my view, this letter constituted hearsay, and its admission, together with the comments that counsel for respondents were permitted to make about it, were so prejudicial that the judgment should be reversed and the case remanded. The rationale for my conclusion is admirably set forth in part I of the original opinion of Justice Bistline, upon which rehearing was granted. That portion of the original opinion is set forth below.

"I.

"Plaintiffs first contend that the trial court erred in admitting a letter by one Dr. Ralph Reitan because it was hearsay not subject to cross-examination and was extremely prejudicial. We agree.

"The principal reason for the hearsay rule is to exclude evidence which cannot be tested through cross-examination:

The rule against hearsay evidence excludes the statement of a person not under oath and not subject to cross examination when the statement is offered for the purpose of proving the truth of a fact contained in it. [Citations omitted.] ... [I]t would appear that the most objectionable feature of hearsay is the lack of cross examination.

G. Bell, *Handbook of Evidence for the Idaho Lawyer* 126 (2d ed. 1972).

The heart of Dr. Reitan's letter is as follows:

I know of no literature, or even clinical experience, relating to possible toxic effects of urea formaldehyde foam. A

problem in evaluating such possible effects stems from (1) a lack of definitive information concerning their possible effects, coupled with (2) the problem of ruling out the many other adverse influences that *have* been identified.

Defendant's Ex. No. 1A (emphasis original).

"Plaintiffs' expert, psychologist Dr. David Hildebrandt, had written to Dr. Reitan regarding the availability of scientific evidence to support a causal link between UFFI and formaldehyde poisoning. A key test used by Dr. Hildebrandt in his neurological evaluation was the Halstead–Reitan Battery of Neuropsychological Tests, developed in part by Dr. Reitan. The letter was an exhibit which the defendants had marked and identified at the taking of Dr. Hildebrandt's deposition. The letter was offered in evidence at the trial by the defendants while Dr. Baker, a plaintiffs' witness, was testifying on cross-examination.

"Defendants assert that the letter was introduced to impeach the statement of Dr. Baker that, in formulating an opinion, he had completely reviewed Dr. Hildebrandt's deposition. Dr. Baker testified that he was not aware of the letter, had not seen it, and hence had not relied upon it. Defendants argued that the letter was not introduced to prove the truth of its contents, and hence was not hearsay. The trial judge was convinced by this argument and admitted the exhibit.

"First of all, accepting that the purpose for the exhibit was impeachment, and accepting that the letter was a part of the deposition, all that was required was to establish that Dr. Baker was in error when he said that he had reviewed the entire deposition. The contents of the letter were irrelevant to this purpose.[1]

"Second, the letter was irrelevant to the question of the basis for Dr. Baker's opinion. Defendants cite *Zier v. Shamrock Dairy of Phoenix, Inc.* [4 Ariz.App. 382], 420 P.2d 954 (Ariz.App.1967) for the proposition that when cross-examining an opposing expert witness a party is granted a wide range of inquiry into the basis of the expert's opinion. However, the case is off point because here Dr. Baker said he had not even seen, much less relied on, the letter in forming his own opinion. *Even more significantly, Dr. Hildebrandt himself said in his deposition that he did not rely on Dr. Reitan's letter.* Thus, the letter played no part in the opinions of either Dr. Baker or Dr. Hildebrandt. Nevertheless, at the very outset of the trial, defendants' counsel was given the opportunity to read the letter to the jury and have it placed in evidence. [Emphasis in original.]

"In that manner, the statement of a world renowned specialist were laid before the jury without his being called as a witness and subjected to cross-examination. Admission of the exhibit was classic hearsay, and its admission was a clear abuse of discretion.

"The letter is objectionable for reasons other than its hearsay nature. Its negative probative value is outweighed by its vastly prejudicial effect. Under the current Idaho Rules of Evidence, Rule 403 provides that such evidence may be excluded. Those rules were not in effect at the time of trial, but Rule 403 is consistent with prior Idaho case law. *See State v. Abel*, 104 Idaho 865, 870, 664 P.2d 772, 777 (1983); Comment to Rule 403, *Report of the Idaho State Bar Evidence Committee* (1985).

"The content of the letter was in error; contrary to Dr. Reitan's statement, there *was* at that time literature relating to the possible toxic effects of UFFI. Some of the articles were attached as exhibits to Dr. Hildebrandt's first deposition.[2] The Reitan letter was extremely prejudicial because Reitan was one of the two developers of the key test for brain damage used by Dr. Hildebrandt to document an important part of the Lundstroms' injuries. The letter could well have created the impression that

---

1. In any event, this impeachment was improper. Whether Dr. Baker had reviewed Dr. Hildebrandt's deposition was clearly collateral to the issues at trial.

2. Another issue on appeal is the trial court's rejection of these articles, discussed *infra*.

plaintiffs' experts possessed no scientific basis supporting the theory of plaintiffs' case. Defendants' counsel were not remiss at final argument to the jury in capitalizing on the court's error:

> But there's absolutely no proof that this chemical is toxic and that it gets to the brain and it would impair someone. Now we hear a lot about the Halstead–Reitan test. And I want you to read Exhibit 3, because that's the letter from Dr. Reitan himself. Here's the author of that test we're all arguing over, and he says, "I know of no literature"—and this is dated January 1st, 1984—"or even chemical experience relating to possible toxic effects of urea formaldehyde foam. A problem in evaluating such possible effects stems from, one, a lack of definitive information concerning their possible effects, coupled with, two, the problem of ruling out the many other adverse influences that have been identified. Sorry I can't be of help."

> Now that's a fact. This is *an absolute expert* in the field whose test everybody uses, and he just *says, no, as of January 1, 1984, there's no literature or chemical experience relating to possible toxic effects of urea formaldehyde foam insulation. Now that's a fact. And that's the letter. I don't see how, based on a letter such as that, they can come up with a theory that the levels we're discussing can cause the harm they're complaining of.*

> R., Vol. 7, pp. 1867–68 (emphasis added).

"Therefore, the introduction of the Reitan letter was error. It was argued to the jury and could not have been other than prejudicial to the plaintiffs, especially when combined with the exclusion of plaintiffs' scientific articles,...."

BISTLINE, J., concurs.