765 P.2d 652

Lowell MADISON, Claimant-respondent,

v.

J.I. MORGAN, INC., Employer; and
Workmen's Compensation
Exchange, Surety, Defendants-appellants,

and

State of Idaho, Industrial Special
Indemnity Fund, Defendant.

No. 16895.

Supreme Court of Idaho.

Sept. 12, 1988.

Dissent on Denial of Rehearing
Dec. 30, 1988.

Clements, Brown & McNichols, Lewiston, for defendants-appellants. Michael E. McNichols argued.

Goicoechea Law Office, Boise, for claimant-respondent. Lynn M. Luker argued.

BAKES, Justice.

Claimant Madison, a 60 year old logger of 32 years, was injured when a snag fell on him. After a hearing, an Industrial Commission referee found claimant to be an "odd lot" worker, concluding that he was totally and permanently disabled. The commission expressly adopted the referee's findings of fact and conclusions of law and ordered payment of claimant's disability benefits. Employer and surety appeal the commission's decision on several grounds, including the referee's refusal to allow the employer to supplement the record with certain post hearing evidence when the claimant was permitted to do so. We conclude that the commission erred in prohibiting the employer from timely taking the deposition of the witness Kerby. We reverse and remand for further proceedings.

I

The facts can be summarized as follows. Claimant Madison, a male timber worker, has lived in New Meadows, Idaho, his entire life, except for 2 1/2 years when he was in the armed forces. The chief industry in the area is logging. Claimant graduated from the local high school in 1942. He has no further formal education. Besides logging, his only work experience has been manual labor on cattle ranches. He received no applicable technical training while in the armed services in the mid–1940's.

Since beginning work with J.I. Morgan, Inc. (employer) in 1951, claimant has been a timber faller, a job involving falling trees, cutting off the limbs, and measuring and bucking the fallen timber into log lengths. Claimant's work has been seasonal, consisting of 40–hour work weeks for approximately 6½ months each year.

On October 28, 1983, the industrial accident relevant to these proceedings occurred. Claimant's left knee, left hip, left arm, back, and right ulnar nerve were injured when a snag fell on him, striking him in the mid-back region and pinning him underneath. Dr. Bills, an orthopedic surgeon practicing in Ontario, Oregon, surgically set claimant's hip.

Sometime prior to mid-April, 1984, when claimant's condition had improved to the point that he might be re-employable, Dr. Bills reviewed written jobsite evaluations for three possible positions with employer.

The evaluations came from Bill Jordan, a consultant for the Industrial Commission's Rehabilitation Division. One evaluation was for the position of "landing man," an individual who, working on relatively level ground, unhooks cables from logs and limbs them. Use of a 25–pound chain saw was required. At that time Dr. Bills approved that job for claimant "with modifications." However, sometime later he explained that those modifications included a 10–pound lifting restriction which essentially eliminated the "landing man" job from consideration. The second job, "sawyer/logger," was the position claimant held when injured. Dr. Bills did not approve this position. The third job was as a "road crew worker," which also involved the use of a 25–pound chain saw to cut brush, fall and limb trees. Dr. Bills did not sign the approval form.

After reviewing the jobsite evaluations in April, 1984, Dr. Bills did not see claimant again until November, 1984. At that time, in addition to the 10–pound weight restriction, he indicated that claimant should only occasionally bend, twist and squat, and should not be exposed to unprotected heights or excessive vibration. (At the time of his deposition in March, 1986, Dr. Bills had further added the condition that the maximum time claimant should spend on his feet at any one time was one hour, with five- to ten-minute rest periods in between, and that claimant should not walk on rough ground or jump down from heights.)

At a prehearing deposition taken by the employer on March 25, 1986, Bill Jordan, the Industrial Commission's rehabilitation consultant, testified that the employer had informed Jordan that it would re-employ claimant as a landing man, as a sawyer, or as a road crew worker if claimant were able to do the job. As the date approached for claimant to return to work (approximately June, 1984), however, claimant objected to returning and did not seek work, "explain[ing] that he is not sure that he would be able to return to the woods at all to work." After his industrial accident, claimant did not seek any work with any employer until spring of 1986. Thereafter, each of claimant's applications indicated a 10–pound lifting restriction. He did not obtain any employment.[1]

The hearing on Madison's claim was held on June 30, 1986. As part of the preliminary matters, the post hearing submission of further depositions was discussed. Referring to Rule IX of the Industrial Commission's Revised Rules of Practice and Procedure, the referee acknowledged that further depositions would be taken and submitted by both parties after the hearing. Rule IX(c) specifically permits that procedure, stating in part, "Following a hearing the record shall remain open for the submission of evidence by deposition for the following periods: all depositions to be submitted on behalf of a claimant shall be taken within 28 days following the date of hearing; all depositions to be submitted on behalf of a defendant shall be taken no later than 49 days following the conclusion of the hearing...."[2]

1. In late August, 1985, claimant had applied for benefits from employer's retirement program, and when he turned age 62 those benefits began. Claimant was also receiving Social Security disability benefits which apparently also converted to retirement benefits at age 62. Claimant was receiving both types of retirement benefits at the time of the hearing on June 30, 1986.

2. The entire Rule IX reads as follows:
"IX
"Presentation of Evidence
"(a) Parties may stipulate the facts in writing and the Commission may make its order or award thereon.
"(b) The testimony of any witness may be presented by deposition, provided that the party offering the deposition testimony pro-

vides reasonable notice prior to the taking of the deposition that the deposition may be used for testimonial purposes. The deposition testimony of any witness may also be presented by agreement of the parties. Absent such notice or agreement, a deposition may be used only to the extent allowed by the Idaho Rules of Civil Procedure.
"(c) Following a hearing the record shall remain open for the submission of evidence by deposition for the following periods: all depositions to be submitted on behalf of a claimant shall be taken within 28 days following the date of hearing; all depositions to be submitted on behalf of a defendant shall be taken no later than 49 days following the conclusion of the hearing; rebuttal evidence

The record discloses the following discussion regarding Rule IX and the taking of additional post hearing depositions by the parties:

"REFEREE: Claimant will be submitting the depositions, after the hearing, of Dr. Ochs, Dr. Fellman and Polly Peterson. Defendants surety and employer possibly will submit the deposition of Dr. Corbin, possibly also the depositions of three representatives of prospective or possibly future employers of claimant, Miss Trahan, Miss Dobson, and someone at The Merc in McCall.....

. . . .

"REFEREE: Surety and employer also may submit the deposition of Mr. William Jordan of the Commission's Rehabilitation Division and Dr. Bills?

"MR. STEGNER: That's correct.

. . . .

"REFEREE: And as I advised everyone before we went on the record, Revised Rule Roman numeral IX of the Commission's Rules of Practice and Procedure now provides that all depositions on behalf of claimant must be taken within 28 days of today's date, and that all depositions on behalf of defendants must be taken within 49 days...."

"All parties are advised to make sure that if you see a problem coming up, you get prior approval through a motion or stipulation and an order from the Commission before scheduling something outside that time period, or you risk not having those depositions being admitted except, of course, for rebuttal testimony, which has to be done on motion also."

The Special Indemnity Fund also indicated that it might depose Dr. Droge, Dr. Nokes, Dr. Jack Long, and the three employers' representatives mentioned above, i.e., Miss Trahan, Miss Dobson, and someone at The Merc in McCall.

After these preliminary matters, a short hearing was held. Claimant Madison presented no witnesses except his own testimony. Mr. Will Kerby, president of J.I. Morgan, Inc., and Mr. Caryl Fausett, office manager for J.I. Morgan, Inc., testified for defendants employer and surety. No other witnesses testified at the oral hearing conducted on June 30, 1986.

Thereafter, on July 23, 1986, as contemplated and discussed at the beginning of the June 30th hearing, the claimant took the deposition of Polly Peterson, a private vocational rehabilitation specialist. Claimant had hired her some nine months before the hearing to evaluate his condition relative to his employability. She had obtained a history and administered a general aptitude test in September of 1985. She also had reviewed the bulk of claimant's medical history. She found claimant to have "quite a few real significant problem areas" in his vocational ability, including low intellectual capacity and manual dexterity scores. Claimant's age was also a very significant factor operating against him, and he had very few skills transferable outside the logging industry. Ultimately, she testified in her post hearing deposition that she believed it was more probable than not that claimant was totally and permanently disabled.

After Polly Peterson's post hearing deposition was taken on July 23, 1986, employer timely noticed the taking of Kerby's deposition for August 11, 1986. Claimant filed a motion for a protective order prohibiting employer from deposing Kerby. Kerby had previously testified at the hearing. Employer intended to elicit information from Kerby establishing that, subsequent to the hearing, employer offered claimant acceptable employment which was compatible with his physical limitations, but claimant declined to accept the employment. After a telephone hearing and the submission of written memoranda, the referee granted the claimant's motion prohibiting the employer from taking Kerby's deposition. The referee stated that Rule IX gave her discretion to determine whether or not to

---

may be submitted by any party upon motion accompanied by a showing of the necessity for the presentation of such evidence. The Commission shall have the power to alter the time limits contained in this rule upon motion by showing a compelling reason for such modification. (New)"

permit parties to submit post hearing deposition evidence.

One of the errors asserted on appeal is that the referee's refusal to permit the taking of Kerby's deposition violated employer's right to a fair hearing. The employer points out the significance of this error by referring to the post hearing deposition of claimant's witness, Polly Peterson, which the referee relied on in finding claimant to be totally disabled. In that deposition Peterson was asked, if she had been aware of the job offer about which Kerby would have testified, "Would you then change your opinion as to whether or not he was totally and permanently disabled?" She answered, "yes." The referee, in her findings of fact, expressly relied on Polly Peterson's post hearing deposition testimony, specifically finding it to be "more persuasive" than the testimony of Mr. Jordan, the Industrial Commission's Rehabilitation Division consultant.

## II

Although the employer raises several issues, we find the procedural issue, the refusal to permit the deposition testimony of witness Kerby to be taken, to be dispositive of this appeal, and we reverse.

Industrial Commission Rule IX(c) specifically provides that, "Following a hearing the record *shall* remain open for the submission of evidence by deposition for the following periods: . . . ." This Court has held on many occasions that the word "shall" denotes a mandatory, not a discretionary act. *Gilbert v. Moore,* 108 Idaho 165, 169, 697 P.2d 1179, 1183 (1985) ("The word *shall,* when used in a statute, is mandatory."); *Pierce v. Vialpando,* 78 Idaho 274, 301 P.2d 1099 (1956); *Hollingsworth v. Koelsch,* 76 Idaho 203, 280 P.2d 415 (1955), *reh'g denied* 1955; *Munroe v. Sullivan Mining Co.,* 69 Idaho 348, 207 P.2d 547 (1949); *State ex rel. Sweeley v. Braun,* 62 Idaho 258, 110 P.2d 835 (1941). The

referee and the commission erred when they precluded the taking of Kerby's deposition. Ironically, in the preliminary proceedings just prior to commencing the hearing on June 30, 1986, the referee acknowledged the right of the parties to submit post hearing deposition testimony. The only condition mentioned in the referee's statement concerning the parties' right to take post hearing depositions was the time limits within which those depositions had to be taken. The referee stated:

"REFEREE: And as I advised everyone before we went on the record, Revised Rule Roman numeral IX of the Commission's Rules of Practice and Procedure now provides that all depositions on behalf of claimant must be taken within 28 days of today's date, and that all depositions on behalf of defendants must be taken within 49 days. . . ."

"All parties are advised to make sure that if you see a problem coming up, you get prior approval through a motion or stipulation and an order from the Commission before scheduling something outside that time period, or you risk not having those depositions being admitted except, of course, for rebuttal testimony, which has to be done on motion also."

The employer noticed Kerby's deposition for August 11, 1986, which was well within 49 days of the June 30, 1986, hearing date. Under the clear mandatory wording of Rule IX(c), the employer should have been permitted to take Kerby's deposition, and the referee's protective order, granting the claimant's motion to preclude the employer from taking and submitting Kerby's deposition, was clear legal error.[3] *Moon v. Investment Board,* 97 Idaho 595, 596, 548 P.2d 861, 862 (1976) ("where a statute or constitutional provision is plain, clear, and unambiguous, it 'speaks for itself and must be given the interpretation the language clearly implies.' ").

We reverse the decision of the referee and the commission which granted the pro-

---

**3.** Our decision today is similar to our recent decision in *Hanson v. BCB, Inc.,* 114 Idaho 131, 754 P.2d 444 (1988). In that case we reversed a decision of the Industrial Commission and ordered it to reconsider the case after excluding certain irrelevant evidence. In this case we are reversing the Industrial Commission and ordering that it reconsider this case with certain relevant evidence included.

tective order; we set aside the commission's final decision and order in this matter; and we remand with directions that the hearing be reopened to permit the employer to take the deposition of witness Kerby for submission to the commission pursuant to Rule IX(c). Thereafter, the commission shall make new findings of fact and conclusions of law based upon all the evidence in the record then before the commission. In view of our action remanding this matter for further proceedings and new findings, conclusion and order, the other issues raised by appellant, which relate primarily to the commission's decision which has now been set aside, are rendered moot.

Reversed and remanded for further proceedings. Cost to appellant. No attorney fees on appeal.

SHEPARD, C.J., and JOHNSON, J., concur.

HUNTLEY, Justice, dissenting.

A trial lawyer reading this decision would have good cause to wonder whether some members of this Court have forgotten their experience and knowledge gained as trial lawyers. The majority opinion is correct in nearly everything it states, but in my opinion, wanders into gross error in not taking the analysis one step further, because it fails to think beyond the rule as to the inherent power, and indeed duty, of trial judges and hearing officers to not clutter the record by permitting witnesses to testify as to irrelevant or inadmissible evidence or evidence which is not appropriate because it is cumulative in effect.

The majority opinion is quite correct when it notes that Rule IX(c) provides for the taking of depositions within certain time limits after a hearing, and directs that the hearing officer do so. Similarly, and parallel in nature, is the duty of a trial judge to take the testimony of witnesses presented in open court. However, when a trial judge refuses to hear or permit the testimony of a witness because the testimony lacks foundation, the expert lacks expertise, or the testimony is cumulative of that of other witnesses, and the trial court

therefore rejects the testimony for one of the appropriate reasons, the Supreme Court on appeal does not reverse and remand to order that trial judge to take the testimony of that witness "because the rules say he should."

The pretext that the surety has dreamed up for urging the error in failure to allow the deposition of the employer representative, was that the purpose of the deposition would be to allow that employer representative, Mr. Kerby, to "authenticate" a letter he had written offering a "make-work" job. There are two things wrong with that position and they are precisely why the referee correctly rejected the evidence:

(1) There is absolutely no need to have a deposition to authenticate a document —the same could be done by attaching the letter to an affidavit (as was done here) and filing the affidavit with the Commission; and

(2) The letter they sought to authenticate was a purported job offer that was not in existence until *after* the close of discovery, *after* the hearing in the case had been held on July 30, 1986, and *after* Will Kerby, the president of J.I. Morgan had already testified at the hearing, until *after* the claimant had concluded the presentation of his case on July 23, 1986, and until *after* the defendants finally realized that the claimant had presented a prima facie case of odd lot disability.

The referee properly rejected the taking of the Kerby deposition stating at page 256 of the record:

Moreover, in this particular case it is hard to imagine a less reliable indication of Claimant's probable wage earning capacity than the self-serving offer of employment by an employer involved in litigation on that very issue, which offer was not made until *almost three years after* the industrial accident. (Emphasis in original).

Finally, and probably most importantly, even if the referee's refusal to admit the letter in evidence were error, it would not be reversible error in light of this record.

Both we and the referee had the letter before us and know what it said and the referee dealt with the legal effect it would have if it were introduced into the record by way of affidavit or deposition and that effect is such as to *not* change the outcome. The conclusion of the referee read as follows at pp. 25 and 26:

All defendants have also made much of Claimant's failure to apply for work with the U.S.F.S. Older Worker's Program. However, the program as described obviously falls outside the general labor market. In fact, it is just the type of "make work" or "sheltered work" provided by a sympathetic employer which Larson, the well-known authority in the field of worker's compensation, indicates should not be considered for purposes of determining permanent disability. *See,* 2 Larson, Workmen's Compensation, § 57.34. See also, *Lyons v. Industrial Special Indemnity Fund,* 98 Idaho 403 [565 P.2d 1360] (1979). Accordingly, the availability of employment within the program and/or Claimant's failure to apply for employment therein, does not defeat a finding of total permanent disability under the odd lot theory.

Finally, it is noted that the finding and conclusion of total and permanent disability herein is not defeated by evidence of the existence of *potential* employment within Claimant's physical restrictions. It is not the *existence* of *potential* suitable employment by which disability is measured under the Idaho worker's compensation law, but the *likelihood* that a Claimant will be able to engaged in gainful activity in the future, including the critical factor of whether potential employers will actually hire the Claimant in light of the pertinent medical and nonmedical factors. In finding and concluding that Claimant herein is an odd lot worker, the Referee has considered this factor and has concluded that it is extremely unlikely that any employer would hire Claimant for any of the few potentially suitable positions in evidence in light of his obvious physical and non-physical limitations.

Hopefully, upon remand, both the Commission and its hearing officer will recognize that the majority has not ruled that the evidence offered, when accepted into evidence, will change the outcome of this case. The Commission should merely receive the evidence and then redecide the case. And it would appear that if there is nothing established beyond what has heretofore been presented, the outcome will be precisely the same because the hearing examiner correctly perceived the value of the evidence when the case was first decided.

BISTLINE, J., concurs.

BISTLINE, Justice, dissenting.

Two opinions from this Court lying side by side in Volume 98 of the Idaho Reports should convince anyone that the Industrial Commission is entitled to be strongly commended for embracing and adopting the findings of fact and conclusions of Referee Naugle, and likewise the referee's order denying the surety's motion to reopen for the sole purpose of taking a deposition to establish a so-called "job offer." Those cases, neither of which merited even a mention in the opinion which Justice Bakes has authored, are *Lyons v. Industrial Special Indemnity Fund,* 98 Idaho 403, 565 P.2d 1350 (1977), and *Francis v. Amalgamated Sugar Co.,* 98 Idaho 407, 565 P.2d 1364 (1977).

*Lyons* was undoubtedly the most important industrial accident opinion emanating from the Idaho Supreme Court in the almost 20 years which have passed since the 1971 legislation, a sweeping revision of the statutory law. By way of background, keep in mind that the recognized authors of the enlightened legislation passed in 1971 were three attorneys who were dedicated to that field, and all three also dedicated to the benevolent purposes of industrial accident and occupational disease law, even though one attorney most generally represented a surety. Those attorneys, George Greenfield, Sam Kaufman, and Jack Barrett not only were instrumental in bringing about the 1971 legislation, but all three played a part in the *Lyons* case.

Not mentioned in the Court's opinion, but a matter of fact, one of the major propositions of law urged upon us in that case was the awkward position of the Industrial Commission in that it was both a party to the action and at the same time the tribunal which had to render a decision which could be against itself as the guardian of the Industrial Special Indemnity Fund. It was not until 1978 that the legislature solved that problem by placing the industrial special indemnity fund under a manager appointed by the director of the Department of Administration. I.C. § 72–324. It is in all likelihood not a mere coincidence that the 1978 legislation followed shortly on the heels of the *Lyons* appeal and opinion, and probably the three attorneys who brought about the 1971 legislation had no small part in the passage of the 1978 statute.

As is readily observed in the *Lyons* opinion, the Court confined itself to deciding the issue presented, which was whether or not the Court would recognize the odd-lot doctrine. Although our *Lyons* opinion does not so indicate, the Court did not *sua sponte* create the odd-lot doctrine, but had that doctrine urged upon it by the appellant, represented by Mr. Greenfield, and by Mr. Kaufman, appearing as *amicus curiae.* Mr. Kaufman's brief on rehearing [1] cited to and relied upon Larson's treatise for application and definition of the odd-lot doctrine:

> Under the "odd lot" doctrine which is accepted in virtually every jurisdiction, total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well known branch of the labor market.
>
> \*   \*   \*   \*   \*   \*
>
> The essence of the odd lot test is the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, *sympathy of a particular employer* or friends, tem-

porary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps.

The Court did recognize the odd-lot doctrine, although the opinion made but one reference to Larson's treatise. Moreover, the Court reviewed the evidence and said of it, "... the evidence *as a matter of law* places the appellant within the odd-lot category." Citing cases, the Court stated, "Where the evidence is undisputed and is reasonably susceptible to only one interpretation, whether a claimant falls within the odd-lot category is a conclusion of law." 98 Idaho at 407, note 2, 565 P.2d at 1354.

In the *Francis* case the Court again reviewed the evidence, and again stated, "We conclude as a matter of law that the claimant has made out a prima facie case that he should be placed in the odd-lot category." 98 Idaho at 409, 565 P.2d at 1366. It is noteworthy that Justice Bakes did not dissent in *Francis.* In *Lyons*, his dissent was solely on the basis that, although he agreed with the Court's factual conclusions, he opined that the Court in so doing, so he thought, was performing a fact-finding function; however, he conceded that "the line between a question of fact and a question of law is often obscure." 98 Idaho at 407, 565 P.2d at 1354.

In Mr. Madison's industrial injury case, it is not the Supreme Court but *the commission itself and in the first instance* which has made the "factual conclusion" (per the language of Justice Bakes in *Lyons* ) that Mr. Madison is in the odd-lot category, and one would think that Justice Bakes would be the first to affirm. But not so, not to be.

Justice Bakes would reverse the commission on the claimed error of "prohibiting the employer from taking the deposition of the witness Kerby," and saying also to bolster this flimsy excuse, "when the claimant was permitted to do so [take the deposition of Polly Peterson]." All three parties through counsel, Messrs. Stegner, Herzfeld, and Luker "stipulated that this deposi-

---

1. For unknown reasons, the 1977 opinion found in Volume 98 Idaho does not show that it issued *after* a rehearing had been granted. The initial opinion is available in 23 I.C.R. 505, September 21, 1976.

tion is being taken in lieu of the witness appearing at the hearing and that it be taken pursuant to the Idaho Rules of Civil Procedure as adopted by the Industrial Commission." Prior to taking any testimony at the June 30 "live" hearing, the Referee stated "Claimant *will be* submitting the depositions, after the hearings of Dr. Ochs, Dr. Fellman and Polly Peterson ..."

Justice Bakes correctly states that the hearing was on June 30, 1986. He perfunctorily adds that Mr. Kerby testified at the hearing, Justice Huntley's dissent having brought that to his attention, BUT gives his reader not an iota of an inkling as to what Mr. Kerby's testimony concerned. Absolutely nothing. The reader might well surmise that Mr. Kerby gave his name and sat down. This is the same identical Mr. Kerby on whose behalf Justice Bakes will give the right to reopen the wholly adjudicated case and say now what he did not say when he was a real live witness sitting on the witness stand. It is highly unusual in the ordinary setting, and more so here. Now, as it would seem to me, being the reasonable person that I am, that, if Mr. Kerby wanted to establish himself as the benevolent person who would rehire his old, faithful, and broken-in-body former employee of 30 years, the opportunity to be heard was presented and quietly eschewed. Fairness demands that a candid world examine what a casual reading shows.

Mr. Kerby took the stand as a witness for his company and its surety; he was examined by presumably his company's attorney, who obviously knew why Mr. Kerby was put on the stand. One reason was to testify that the nearly 62–year old and injured Mr. Madison was interested in retiring, and wanted to know what, if any, benefits he was eligible for from J.I. Morgan, Inc. He did so. A second reason was to testify that Mr. Madison had not asked to be reinstated in some capacity. He did so. Mr. Madison was present at the commission's hearing room at this very time. Over objection, Mr. Kerby was allowed to show his familiarity with Mr. Madison's physical condition, after which he stated (hypothetically):

We have had employees in the past that have done that. And I feel if he would have been serious about working, that we would have looked for something further that he could have possibly done, in the shop sweeping or out working on houses.

Tr., p. 88.

Significantly, Mr. Kerby said no more than that. It was an example of hedging at its best. Specifically he did not say that Mr. Madison *would be hired* to do something, anything. Implicitly, he questioned Mr. Madison's sincerity, and, significantly, the best he came up with was a suggestion that if Mr. Madison was serious about working, "we would have looked for something ..."

Viewed in perspective, it was an appropriate time, however, for Mr. Kerby to have forthrightly said, "Lowell, as soon as you feel up to it, we have a job for you, even if we have to create it." But this did not happen.

What did happen immediately after that answer was given was to mark Defendant's Exhibits 4 through 13, color prints of pictures which Mr. Kerby had taken of Mr. Madison four days before the hearing, pictures of Mr. Madison which Mr. Kerby was able to take by sneaking through the woods and then hiding in the brush at dusk. Mr. Kerby, who would much later surface as a benevolent employer, wanting to rehire Mr. Madison, explained his pictorial spying:

We have a dirt crew that works out there, and I—Caryl and different people told me that Lowell and Mark were getting wood quite often out there. And I thought, well, if he is getting wood, that's the only place I heard—

\*   \*   \*   \*   \*   \*

And I just felt that if that was the case, that would be a good way to do it, and that's what I did.

\*   \*   \*   \*   \*   \*

I talked to the road foreman out there, and he just—there was a wood log there, and I says, 'Gee, that's a nice wood log.' And he said 'Yeah. Mark, Lowell's son,

is coming out to cut it up tonight.' That was why I went and took the pictures. Tr., 94–95. Mr. Kerby narrated the prints:

... the sequence of these pictures show that he had a shovel part of the time, and his son asked him to dig out underneath the logs so the saw bar wouldn't get into the dirt. Then, he was picking up pieces out of the road. And there is two pictures in the sequence that depicted a piece of bark that was probably a foot or so wide and about six feet long.

Q. Do you know how much that would weigh?

A. I would guess that that would weigh 30, 40 pounds. I don't know. I would have to guess it would weigh about that. It was six feet long. He picked it up and set it upon on the log and then threw it off the log. Then, as I said, he did shoveling for Mark when he asked him to.

Then Mark said, 'Well, you can start splitting these.' And he took a wedge,

which I don't know what weight wedges —or not a wedge, a sledge hammer— some of them are six pounds. None of them are lighter than that. Some of them are eight pounds. Then Mark asked him to start quartering the block. At that point some of the pictures show that—him with the hammer, and that's what he did.

Tr., p. 95–96.

Mr. Kerby volunteered that he brought with him a "video camera, but it was too dark to take pictures." He learned this maneuver from experience, "I think it stems back to Oregon Comp people that we had take pictures of people that said they couldn't work and were working, and I got the idea." Tr., p. 102–103. He explained, "I was just more inquisitive than anything." He began to volunteer some elaboration, was met with an objection, but not one of the three attorneys would put a question to him,[2] not even the attorney

**2.** Mr. Madison at his turn, told exactly what this was all about:

Well, I went up with my son to get wood. He wanted me to go along with him in case something happened to him, you know, and company. As far as what Mr. Kerby saw me doing here, why, a six-year-old kid could have did it. So I don't see where I put forth any effort or did something I shouldn't have.

Q. With regard to the use of the shovel, what were you doing there?

A. I just had a short-handled shovel, and I was digging the dirt out from under so his saw wouldn't go through and hit the rocks.

Q. How much dirt were you taking out of there? Were you pulling dirt out?

A. Yes. Just a little bit on the shovel and pulling it out and throwing it away?

Q. Did you do that for very long?

A. No.

Q. How long?

A. I think I just did it to two of them. I bet it wasn't over five minutes.

Q. What about splitting the wood then?

A. Not much effort here either, because it split so easily.

Q. Was it pretty dry wood?

A. Yeah. It was dry and it had a pretty big pitch seam in it, and you just put the wedge in and just tap it and it fell apart.

Q. How heavy was the maul that you were using?

A. I think it was a seven-pound maul.

Q. Do you recall about how many you split?

A. Well, I halved—I think I halved three and I quartered one of them.

Q. What about the bark, could you tell us about that?

A. Well, I think Mr. Kerby exaggerated the weight of the bark. Dry bark doesn't weigh much of anything. And I put it up on the—I raised one end of it upon the edge of the log and then pushed it on over, so there wasn't any—much of any effort to—actually, I wasn't lifting all the weight.

Q. Now, was this just bark? Did it have any of the wood in it?

A. No. It was just plain bark that fell off of the log.

Q. How heavy do you think it might have been?

A. The whole thing might have actually only weighed 20 pounds, but I never did lift all that weight; put the end of it up on the log and then pushed it on over.

Q. Is the kind of work that you were doing up there anything like what you do out on the job at J.I. Morgan?

A. My gosh, no. Like I said, any kid could have did what I did there. In fact, my daughter—or—yeah, my daughter-in-law split the wood and she's seven and a half months pregnant.

Q. Do you like to get out once in a while, out of the house?

A. Why certainly.

Q. Do you try and do things around the house?

A. Oh, I try to, yes, do what I can. Of course, there are some limitations to how much I can lift and so forth.

retained by the surety, who candidly stated that he had not seen the pictures until the morning of the day of hearing.

Almost one month after the June 30th hearing in Boise, counsel for J.I. Morgan sent this letter of July 29, 1986, to counsel for Mr. Madison, with copies thereof to Mr. Kerby and counsel representing the I.S.I.F: .

I am writing to inform you that my client, J.I. Morgan, Inc., intends to and will be offering your client, Lowell Madison, a job. While I do not have all the particulars of the job, I can relate to you that the offer is for full-time employment at $5.85 per hour. Will Kerby and Caryl Fawcett tell me that they can provide employment within his limitations. I enclose a copy of the notice of taking the deposition of Will Kerby for August 8, 1986, in New Meadows, Idaho, at the offices of J.I. Morgan, Inc., at 11:00 a.m. (Mountain Daylight Time). I expect to inquire of Mr. Kerby at that time of the particulars of the job offer and what Mr. Madison's response to that offer is. Rather than go to the expense of having a deposition, I would prefer to simply present stipulated facts to the commission, however, I can understand your position if you are unwilling to agree to such a proposal. Please let me know at your earliest opportunity if you would be willing to enter into an agreed stipulation of facts.

One day earlier than that, Mr. Madison was handed this letter from Mr. Kerby:

Q. Do you rest quite a bit?
A. You bet; work a little while or dig around a little while and then rest.
Q. Some of those pictures there where you were standing with a shovel next to you, what were you doing there?
A. Sometimes I was just leaning on it, if I recall correctly. Right here, I was just more or less leaning on the shovel right there.
Tr., p. 112–115.

# J. I. MORGAN, INC. —— Logging

NEW MEADOWS, IDAHO
83654

OFFICE PHONE: 347-2222
SHOP PHONE: 347-2226

August 4, 1986

Mr. Lowell Madison
HC 75 - Box 3355
New Meadows, Id.  83654

Dear Lowell;

**RECEIVED BY**

AUG 6 1986

CLEMENTS, BROWN,
McNICHOLS

When you retired you did not mention any desire to return to work and we assumed that you did not wish to continue with your employment at J. I. Morgan, Inc. We now understand that you are interested in work and in fact made application for employment with other employers in this area.

We are pleased to offer you full time regular employment with J. I. Morgan, Inc. The offer is for full-time employment, 40 hours a week, 48 weeks per year. You will be paid $5.85 per hour and will receive most benefits including a four-week paid vacation. Depending upon the time of year, and the seasonal work schedule of our firm, we expect that your position will call upon you to act as a carpenter's assistant, a janitor, a parts-chaser, and perhaps to perform clerical duties, as well as other work within your capability.

As you know our company makes every effort to accommodate handicapped workers. We are familiar with the restrictions imposed by Dr. Bills and are confident that you can perform the work we are offering with those restrictions.

This position of employment is now open and immediately available to you. Since time is of the essence we need to have your response by August 8th, 1986. We look forward to welcoming you back as a full time employee of J. I. Morgan, Inc.

Sincerely,

J. I. MORGAN, INC.

Will Kerby - President

cc: Lynn Luker
    John R. Stegner

---

A defendant's exhibit, the case-notes of Mr. Jordan, show that early on, June 13, *1984*, Mr. Jordan made a personal visit at the company offices, and verbatim those notes disclose that he,

"spoke with Carroll Fawcett, office manager.... Carroll indicated that the company is willing to take the claimant back into employment if he is physically able to handle the work, and he reiterated that the company would make modifications, where possible, to assist the claimant in returning to work."

This altruistic thought eventually materialized into a written offer handed to Mr.

Madison by Mr. Kerby *more than two years later* and after the litigation was all but concluded, with the employer, through its Mr. Kerby, not passively watching the surety battle Mr. Madison, as is the usual case, but endeavoring to defeat its employee's compensation claim by pictorial surveillance and testimony. Claimant's counsel quickly moved for a protective order.

The commission's referee allowed counsel adequate time for briefing, following which the Order was granted, the record stating in part:

> The testimony allegedly to be adduced will apparently indicate that Claimant has been offered but has not accepted suitable employment by Employer since the time of the hearing of this matter on June 30, 1986.
>
> \* \* \* \* \* \*
>
> Claimant has argued that the admission of *such evidence*, which *did not come into existence until after the hearing*, would be irrelevant, unfairly prejudicial, contrary to the orderly presentation of evidence, unethical, and would ultimately necessitate protraction of this proceeding for surrebuttal by Claimant, to the disadvantage of the parties and the Commission.

R., p. 115–116.

Justice Bakes goes way far afield, taking two other justices with him, when he declares that following a hearing for the presentation of oral testimony the right to later take deposition testimony included a Mr. Kerby who had already testified.

The discussion between referee and all counsel which took place as the June 30, 1986, hearing opened had to do only with the deposition testimony of *expert*, not lay witnesses, and certainly did not include a lay witness who was then present and ready to testify, and who in fact did testify. Mr. Kerby had a full opportunity to say whatever it was he wanted to say, and he did so.

Far in advance of the June 30, 1986, hearing before the referee the defendants caused to be taken the deposition of William C. (Bill) Jordan. On March 25, 1986,

Mr. Jordan, examined by defendants as a defense witness, who had been in constant touch with the treating physician, Dr. Gary Bills, gave this testimony:

> Dr. Bills later in a letter to Lynn Luker, the claimant's attorney, described other difficulties and continuing difficulties, saying that the claimant could lift only 10 pounds and would need to find work where he could stand and sit discretionarily. And he did not believe that the claimant would ever return back to his work in the logging industry.

Deposition of William C. Jordan, March 25, 1987, p. 4–5. In the record also as Exhibit 2 in the Jordan deposition is a letter of October 28, 1985, to Mr. Madison's attorney and to the surety's claim representative, one part of which recounted an examination of claimant by Dr. Tregoning, an orthopedist in Boise, whose conclusion was "that he would be very hesitant to anticipate that the claimant would return to the logging industry." That letter, a full seven months prior to the hearing in June where Mr. Kerby testified, and nine months prior to the attempt to have Mr. Kerby testify by deposition, contained this information:

> The claimant was apparently next seen by Dr. Bills on July 5, 1984. At that time, Dr. Bills noted that the claimant had continued problems after multiple injuries which were compounded by his thoracolumbar spondylolysis. Dr. Bills noted at that time that he did not believe the claimant would be able to return to the logging industry and declared the claimant medically stationary. Dr. Bills also stated that he believed that the claimant could do modified work where sitting and standing would be discretionary.
>
> \* \* \* \* \* \*

Dr. Bills reiterated the claimant's limitation in a letter to Lynn Luker, the claimant's attorney, in December 1984. At that time he stated, 'In the past we have attempted to encourage Mr. Madison's return to work; however, this would have to be modified work where he could sit or stand at this discretion, and I do not believe that this would allow him to

return to his previous work as a timber faller. Because of the combination of discomfort in the left hip and the thoracolumbar symptoms, and the weakness in his left hand, I believe his lifting would be limited to a maximum of 20 degrees, and he could carry 10 pounds, i.e., light work. I believe he could occasionally bend or twist and occasionally squat. I do not believe that he should be exposed to unprotected heights nor excessive vibration.'

\* \* \* \* \* \*

In determining a logger's longevity in the logging industry, a telephone survey resulted in the following information:

J.I. Morgan Company, New Meadows, Idaho, presently has 125 employees including two tree fallers, 57 and 59 years of age; one truck driver, aged 61; and one landing man, aged 62.

Sindt Logging Company in Meadowhurst, Idaho, employs approximately 50 to 60 people. They employ one landing man who will soon turn 60. They also employ one equipment operator who is about 53 or 54.

Rath Brothers Logging, Hayden Lake, Idaho, hires 100 to 120 employees during their peak season. They have no one over 60–years of age working for them. Their parts man would be their oldest employee, and he has never been a tree faller.

Merritt Brothers Lumber Co., Priest River, Idaho, indicated that they are a sawmill and contract loggers. They don't have anyone over 60 working for them. They do have two older people working for them doing cleanup and carpentry work.

The above information seems to indicate that a logger's job longevity, especially in the area of three falling, is limited. In essence, one finds very few 60–year–old individuals engaging in tree falling as an occupation in the logging business. Also it is safe to say that one finds few people over age 60 in other occupations in the logging business in general.

The claimant would be able to drive to the McCall area for employment. In contacting employers in the area, it was learned that counter work such as inventory clerk, cashier clerk positions, and gas station attendant positions were *periodically* available.

Mr. Jordan, an employee of the Industrial Commission, who appears to be a most thorough, and fair-minded person, was a defendant's witness when his testimony was taken and his documentation admitted as exhibits.

The purpose of showing this evidence is not only for the content, which is very much favorable to Mr. Madison and the decision of the referee, in turn adopted and becoming the decision of the commission itself, it is to demonstrate that the employer and its surety were well advised at an early time, long before the June 30 hearing of Mr. Madison's job search in the New Meadows area.

Yet, notwithstanding such a strong factual background, the defendants presented the referee with an August 6, 1986, letter stating, "We *now* understand that you are interested in work and in fact made application for employment with other employers in this area.... We look forward to welcoming you back as a full time employee of J.I. Morgan, Inc."

A skeptic might wonder how long that employment was guaranteed to a crippled 63–year old man who knew nothing but working in the woods, and nothing about carpentry work, janitoring, parts-chasing, and clerking, insofar as this record shows. A skeptic might also wonder how a $324 monthly pay check for 48 weeks equates with what the surety is obliged to pay under an award of total permanent disability.

The referee did not err in ruling that the deposition of Mr. Kerby would not be allowed. When the referee was called upon to again pass on that issue, the answer was again a correct negative. Justice Bakes in his opinion provides the entire text of Rule IX in his footnote 2, removing any reason for me to repeat it. Justice Bakes omitted to advise that the referee explained the purpose of the rule, and the non-purpose as well:

*The purpose of allowing the record to remain open after the hearing is not so that the parties may manufacture, soli-*

*cit, or even gather evidence,* but rather to allow a reasonable amount of time for the scheduling and taking of post-hearing depositions, usually those of doctors with full and busy schedules who need significant advance notice for such depositions. *Allowing deposition testimony such as that contemplated by Defendants Surety/Employer herein would lead to prolongation of the proceeding for rebuttal and possible surrebuttal of the parties.*

R., p. 255–256.

That statement is a truism with which any practitioner conversant with the practice in this area of the law would quickly agree. Sam Kaufman said the same thing in the thorough and knowledgeable brief he provided us in the *Lyons* case, *supra.* An acclaimed expert in this body of law, he wrote back in 1976:

Medical experts are seen and heard by the Industrial Commission with unique regularity. They are experts—albeit there is conflict in their opinions. Their views are not comparable to the man on the corner who claims to have witnessed an accident or overheard a conversation. The appearance and demeanor of these experts is totally immaterial to their testimony. Some are liberal in their opinions and judgments, others are conservative, none are shifty eyed prevaricators who a jury, a court or a Commission might suspect of perjury.

It is immaterial therefore that the Commission see and hear these expert witnesses to judge the weight to be given their testimony.

\* \* \* \* \* \*

From a practical standpoint, although under deposition the opposing party has the right of cross-examination, there is very little distinction between depositions and medical reports. Obviously the medical evaluations of this case were submitted by report only with consent of counsel and had cross-examination been desired, this would not have been done. Furthermore, the intent of the compensation law is to make the process as summary and simple as reasonably may be and as far as possible in accordance with the rules of equity. (*Idaho Code* 72–708)

This is the intent not only of the law but, generally speaking, the manner in which counsel engaged in the compensation field conducted their practices. More and more there is resort to submission of medical reports in lieu of personal appearance or deposition of medical experts. It saves time and particularly money—which few claimants can afford. Few cross-examinations will confound the medical expert and in most cases his report might just as well be his testimony.

\* \* \* \* \* \*

While claimant might be able to do something worthy of compensation, he is really so disabled that a reasonable stable market for his services does not exist and all avenues of gainful employment are reasonably closed to him.

We appear to have here a typical "odd lot" case; a man who is so handicapped not only by physical impairments, but by age, lack of education and usable skills, that he will not be employed regularly in the labor market.

The referee in this case was 100 percent correct in assessing the highly suspect circumstances of Mr. Kerby's job offer:

Moreover, in this particular case it is hard to imagine a less reliable indication of Claimant's probable wage earning capacity than the self-serving offer of employment by an employer involved in litigation on that very issue, which offer was not made until *almost three years after* the industrial accident.

R., p. 256 (emphasis in original).

Justice Bakes makes no attack whatever on the referee's written decision. He would simply reverse and remand for the sole purpose that the case "be reopened to permit the employer to take the deposition of witness Kerby, etc." As I read his directions, he dismisses the referee and would have the commission itself make new findings of fact and conclusions of law. In my view, those directions are to carry out a futile and needless exercise. The "sure and certain relief" promised by the worker's compensation law evaporates. Mr. Madison will be 65 years old on Octo-

ber 1. Hopefully he may see the day that his case is brought to a conclusion.

Back of all of this tom-foolery about noncompliance with a rule is the singular fact that Mr. Kerby did testify, having done so at defendant's pleasure and absent any objection. Similarly, no objection was made to the filing of Mr. Kerby's affidavit. The referee saw it in the file. The referee commented on it, and those remarks are set out herein. I saw it in the file. Every member of this court knows its content. We all know of the belated offer of a job. We all know that, at best, it comes from a former employer, J.I. Morgan (and perhaps the surety, in which regard that is up to them, and certainly not criminally or morally wrong, just business), and is facially an offer from a sympathetic employer, *Lyons, supra*, 98 Idaho at 406, 565 P.2d at 1353. We all know that, at worst, it was an offer made belatedly by a former employer, and was simply based on economic factors, an offer made in the face of evidence which as a conclusion of law would place Mr. Madison in the odd-lot category. The referee did find that Mr. Madison was not possibly a candidate for the labor market in his community, or any place else near his community. The deposition of Mr. Kerby if taken will be of the same vein as his affidavit and letter. It cannot change one thing.

This opinion opened by extolling the virtues of this Court's *Lyons* opinion, and as well *Francis* and the many other cases which have followed it. Today's opinion by the majority sets the state of the workers' compensation law back a good 12 years. Worse than that, it may be seen as portending a trend. And, it cannot help but be demoralizing to the referee and the commission who faithfully followed the precepts announced by this Court in the *Lyons* case.

If three members of this Court persist in reversing the commission's decision on such a pretext as we see before us, more months, maybe a year, will go by, and there yet remain to be decided other issues raised by the surety's appeal. Lowell Madison will know that the real issues raised on the surety's appeal have been sidestepped and put aside for another day— which he may live to see.

## DISSENTING ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Justice dissenting on denial of Petition for Rehearing.

There are two votes for the granting of rehearing which has been requested by the claimant, Madison. Under the rules of the Court, however, on a 3–2 majority opinion, a rehearing will not be granted unless at least one person in the majority votes for the rehearing. The rule is probably sound as a generality, but the rule requires a certain amount of flexibility. My own practice which is well known by the other members of the Court, is to honor the request of my vote for a rehearing even though at the time as a member of the majority I doubt that I can be persuaded. As the Court minutes will reflect, and our opinions will show, my view and my vote has been switched on a rehearing. I do not see that as a frailty.

The issue upon which the three-member majority has reversed this case has been described as a pretextual and serving no purpose, either in further proceedings before the Industrial Commission, or on any subsequent second appeal to this Court.

The function of a petition for rehearing is to provide the Court an opportunity to reconsider its decision. Its decision in this case was to reverse the Commission with directions to reopen the hearing, to permit the employer to take the deposition of Kerby, and for the Commission to redecide the case. These directions include the submission of the deposition to the Commission. Missing, however, is any direction mandating the Commission to receive it in evidence. It is certainly within the prerogative of the Commission to exclude the deposition, simply on the basis that it has the same evidence before it in the form of the letter; the Commission has previously decided that such evidence is not germane to its decision. The Commission has previously ruled as much. That which is not germane is also not relevant.

I submit to those in the majority that, should they be so bold, and should they on reflection continue to assert that the deposition testimony is relevant, then by the same token, so likewise is the letter rele-

vant. Then, all that needs be done by the majority is to deem the contents of the letter admitted into evidence (much the same as the majority in *Lundstrom v. Brekke*, 115 Idaho 156, 765 P.2d 667, *"deemed it clear that the defense was entitled to produce the Reitan letter* as a means of impeaching the testimony of Baker." (115 Idaho 160, 765 P.2d at 671). Then with the letter in evidence, the majority can decide the case as its will dictates, and the litigation will not be further prolonged. An over-worked Commission can attend to other compensation cases.

I am saying that such is what the majority *could* do. It is not a recommendation. What I recommend is that one member of that majority condescend to vote—not that Commission now be affirmed, but that the point at issue be reconsidered. On reconsideration all that the majority is asked to do is entertain a second thought as to the wisdom of its mandate. Surely one of the three might see that the August 4, 1986, letter from Mr. Kerby to Mr. Madison is just exactly the type of make-work offer based on the (belated, but possible) sympathy of a particular employer (forgetting that he previously had played insurance adjustor helping to make out a case against his faithful and long-time employee) extended to a handicapped former worker. The language, other than parenthetical, is not my own, but excerpted from the *Lyons* case, 98 Idaho at 406, 565 P.2d at 1363.

It is to be noted that the letter, though it offers full time employment, makes no suggestion whatever as to duration.

As counsel points out in the brief supporting the petition, the majority opinion denigrates the inherent power of the Commission to an exercise of discretion to interpret its own rules. As also pointed out in that brief, the decision of the Commission carefully explained the purpose of the rule:

> The purpose of allowing the record to remain open after hearing is not so that the parties may manufacturer, solicit, or even gather evidence, but rather to allow a reasonable amount of time for the scheduling and taking of post-hearing depositions, usually those of doctors with full and busy schedules who need signifi-

cant advance notice for such depositions. Allowing deposition testimony such as that contemplated by defendants surety/employer herein would lead to prolongation of the proceeding for rebuttal and possible surrebuttal of the parties. (Record, p. 255–256).

The trial bar may well wonder, as do I, by what authority this Court has now determined that it can dictate to the Commission the rules under which it operates. As is only too well known, the Court is quite busy with its own rules—883 pages bound volume, 67 pages pocket parts.

A rehearing should be had, in which event this dissent could be discarded.